IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

CARLTON & HARRIS CHIROPRACTIC,
INC., a West Virginia corporation,
individually and as a representative of a class
of similarly-situated persons,

       Plaintiff,

v.              CIVIL ACTION NO.  3:15-14887

PDR NETWORK, LLC,
PDR DISTRIBUTION, LLC,
PDR EQUITY, LLC, and
JOHN DOES 1-10,

       Defendants.

**MEMORANDUM OPINION AND ORDER**

  Pending before the Court is a Motion for Summary Judgment on behalf of Defendants PDR Network, LLC, and PDR Distribution, LLC, and PDR Equity, LLC (collectively referred to as "PDR Network"). ECF No. 126. Plaintiff Carlton & Harris Chiropractic, Inc. opposes the motion. Upon review of the parties' arguments and submissions, the Court **GRANTS** the motion for the following reasons.

**I.
BACKGROUND**

  On September 6, 2023, the Fourth Circuit Court of Appeals issued its most recent decision in this case's lengthy procedural history. In vacating and remanding this Court's dismissal of the First Amended Complaint Class Action Complaint, the Fourth Circuit found that Plaintiff adequately alleged that an unsolicited fax from PDR Network "offering a free eBook with information about prescription drugs . . . had the necessary commercial character to make it an

'unsolicited advertisement' under the Telephone Consumer Protection Act of 1991 (TCPA), 47 U.S.C. § 227.[1] *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 80 F.4th 466, 470 (4th 2023) (*PDR VI*). In its decision, the Fourth Circuit stated that the key issue "is whether a fax that touts the 'quality' of a 'good[]' that is offered for free, rather than at a price, can fall within" the TCPA's definition of an "unsolicited advertisement." *Id.* The TCPA defines an "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5).

As explained in prior opinions, the fax at issue was sent to Plaintiff, a chiropractic office, in 2013 by PDR Network, the publishers of the *Physicians' Desk Reference*® (PDR). *See, e.g., Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC* (*PDR I*), 883 F.3d 459, 462 (4th Cir. 2018).[2] The PDR lists certain prescription drugs with the prescribing information, and pharmaceutical companies pay the PDR Network for their drugs to be included as a listing. *Id*. PDR Network then distributes the pharmaceutical companies' listings to healthcare providers. *Id.*

The fax at issue was addressed to Plaintiff's "'Practice Manager' and urged the recipient to 'reserve' a 'FREE 2014 *Physicians' Desk Reference* eBook.'" *PDR VI*, 80 F.4th at 470. The fax included an internet link, a customer service phone number, an email address, and instructions of how to opt out of fax notices. *Id.* at 470-71. It also provided information stating, "[t]he eBook contained the '[s]ame trusted, FDA-approved full prescribing information' as the hard-copy

---

[1]Section 227(b)(1)(C) generally prohibits "unsolicited advertisement[s]" to be sent to fax machines. 47 U.S.C. § 227(b)(1)(C).
[2]*Vacated and remanded on other grounds*, *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 588 U.S. 1 (2019).

*Physicians' Desk Reference*, but [n]ow in a new, convenient digital format,' and it had been '[d]eveloped to support your changing digital workflow.'" *Id*. (citation omitted).

In March 2021, Plaintiff filed its First Amended Class Action Complaint, alleging new theories of recovery. One theory is "that PDR Network effectively earned a commission for each successful promotion of an eBook by way of fax, because the amount paid by drug companies to have their products included in the *Physicians' Desk Reference* turned on the number of eBook versions distributed." *Id*. at 472; *see First Am. Class Action Compl.* ¶20.[3] Another theory is "that the fax was a 'pretext' or prelude for future sales efforts, in that it notified recipients they would continue to receive faxes 'about healthcare products and services from PDR.'" *Id.*; *see First Am. Class Action Compl.* ¶19.[4] Upon motion of PDR Network, this Court dismissed these claims by

---

[3]Paragraph 20 of the First Amended Class Action Complaint provides:

> Defendants receive money from the pharmaceutical companies whose drugs are listed in the *Physicians' Desk Reference*, and, on information and belief, the amount of money that Defendants receive from the drug companies whose products are featured in the 2014 PDR e-Book turns on how many copies of the 2014 PDR e-Book Defendants distribute, and so Defendants stand to profit when a provider accepts a free copy.

*Id.*

[4]Paragraph 19 of the First Amended Class Action Complaint states:

> In addition to being an "advertisement" on its face, [the fax] is also a "pretext" to future advertising or part of an "overall marketing campaign" because it states that if a recipient does not "opt-out of delivery of clinically relevant information about healthcare products and services from PDR," then the recipient will continue to receive faxes "about healthcare products and services from PDR via fax" in the future. On information and belief, those future faxes pertain to Defendants' commercially available "health knowledge products and services," their "behavior-based prescription management programs," their "event-driven and clinically relevant healthcare messaging," their "Physicians' Desk Reference® suite of services," their "interactive drug information

Memorandum Opinion and Order entered on February 8, 2022. *Carlton & Harris Chiropractic, LLC v. PDR Network, LLC*, Civ. Act. No. 3:15-14887, 2022 WL 386097 (S.D. W. Va. Feb. 8, 2022).

In deciding whether dismissal was proper, the Fourth Circuit held the term "advertisement" under the TCPA "is limited to faxes that are 'commercial in nature.'" *Id.* (quoting *Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.*, 788 F.3d 218, 224 (6th Cir. 2015)). The Fourth Circuit explained that an advertisement is more than something just transmitting information, it is transmitting "information with a 'commercial nexus' to the sender's 'business.'" *Id*. at 473 (quoting *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharms., Inc.*, 847 F.3d 92, 96 (2d Cir. 2017)). The Fourth Circuit emphasized that "[a] prohibited 'advertisement'" under the TCPA is one comprised of "a 'commercial solicitation' – 'of, in, or relating to commerce,' with 'profit as the primary aim.'" *Id.* (quoting *Sandusky*, 788 F.3d at 225, 222-23 (internal quotation marks omitted in *PDR VI*)). In other words, a fax without a commercial component is not barred by the TCPA. *Id*. at 474 (citations omitted).

Applying this definition to the First Amended Class Action Complaint's new theories of recovery, the Fourth Circuit found Plaintiff's claim that PDR Network is paid a commission based upon how many eBooks are distributed, assuming its truth, sufficiently alleges a commercial component to survive a motion to dismiss. *Id.* at 475. The Fourth Circuit highlighted the fact the fax promoted the "quality" of the eBook to benefit a recipient's medical practice and, under Plaintiff's theory, if a medical provider accepts the "pitch" in the fax and accepts an eBook, it

---

services for EHR/EMR systems," their "digital communication services," "PDR.net®," and "mobilePDR®."

*Id*.

benefits the PDR Network's business of distributing the PDR "and an associated 'suite of services.'" *Id*. at 475-76. The Fourth Circuit stated the TCPA does not limit the commercial aspect of an "unsolicited advertisement" to a direct sale and it maintains a "'commercial' character" if PDR Network is paid by a drug company when a medical provider orders a free eBook after receiving a fax. *Id*. at 476. It is the combination of the fax touting the "quality" of the eBook and a commission if the pitch is successful "that makes the fax in question sufficiently commercial to qualify as an 'advertisement' under the TCPA." *Id*. at 477.

Turning next to Plaintiff's second theory that the fax is mere "'pretext' to future advertising," the Fourth Circuit agreed with this Court in holding that Plaintiff cannot establish pretext by arguing that, whether it accepts the eBook or not, it will continue to receive promotional faxes as established in the fax's opt-out notice. *Id*. at 479.[5] Rather, under the pretext theory, Plaintiff must show its acceptance of the free eBook will result in a subsequent sale pitch, thereby, creating a commercial nexus. *Id.* If, as Plaintiff asserts, it does not matter if it accepts the eBook then the commercial character under the pretext theory is missing and fatal to the claim. *Id*.

Following the Fourth Circuit's decision to vacate and remand this case for further proceedings on Plaintiff's commission theory, this Court entered an Order allowing six months of discovery on that limited issue. At the conclusion of discovery, PDR Network filed the pending motion for summary judgment. With briefing complete, the Court considers whether summary judgment should be granted.

---

[5]The fax's op-out-provision furnishes the recipient a phone number to call *"[t]o opt-out of delivery of clinically relevant information about healthcare products and services from PDR via fax[.] . . . You are receiving this fax because you are a member of the PDR Network." Fax from PDR Network to Pl.'s Practice Manager* (Dec. 17, 2013), ECF No. 82-1, at 2 (italics original).

## II.
## SUMMARY JUDGMENT

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III.
## DISCUSSION

After nine years of litigation, this action has been whittled down to a single issue: whether Plaintiff is able to offer more than a scintilla of evidence from which a reasonable juror could find PDR Network receives a commission from pharmaceutical companies when a healthcare provider accepts a free eBook. During discovery, PDR Network produced a copy of a Services Agreement it had with Bayer Healthcare Pharmaceuticals, Inc., a company whose drug information is

contained in the 2014 edition of the PDR. *Servs. Agreement*, at 1, ECF No. 126-3. In the Services Agreement, Bayer agreed to pay PDR Network for a subscription to PDR Network's Drug Information Services ("DIS") from August 1, 2013, until July 31, 2014, for a listing of two of its drugs. *Id.* at 1-2. The "Services" covered by the agreement included:

> (a) 2014 Edition of the *Physicians' Desk Reference* ("PDR Main");
> (b) Bi-Monthly 60-day Updates ending July 2014;
> (c) 12 monthly eDrug Updates to 370,000 MD;
> (d) Real time access via PDR.net, PDR's regulatory data feed into the EHR [electronic health record] market via PDR BRIEF and PDR Search, PDR Electronic Library datafeed into the Hospital market and *mobile*PDR; and
> (e) EHR Product Support Messaging Distribution Services.

*Id.* at 1. The contract further sets forth the amount Bayer was obligated to pay for the listings. Specifically, the Services Agreement provides:

> For Services requested by BAYER and satisfactorily performed by [PDR Network] during the term of this Agreement, BAYER shall pay [PDR Network] a maximum of [the combined total of the "Price Per Label"],[6] payable as invoiced in accordance with the terms of this Agreement and as follows:
>
> | # of Labels | # of Grids[7] | Product Name | Price Per Label |
> |---|---|---|---|
> | 1 | 2 | Desonate Gel | [redacted] |
> | 1 | 2 | Finacea Gel, 15% | [redacted] |

*Id*. For its part, PDR Network also agreed to

> distribute the Product Information in the [DIS] which shall include the 2014 PDR and list the applicable key portions . . . of the Product Information in its PDR 60-day Updates to U.S. Medical Doctors and Doctors of Osteopathy . . ., the names of Manufacturer's drugs whose Product Information is published in the 2014 PDR and whose Product Information has changed since the initial first publication of the 2014 PDR as well as the PDR Drug Information Service electronic properties described above. The 2014 PDR and PDR 60-

---

[6] The actual price paid by Bayer is contained within a sealed copy of the Services Agreement filed by PDR Network. *See Ex. C*, ECF No. 132.

[7] In Appendix 1 attached to the Services Agreement, "[o]ne grid equals one by one inch." *App. 1 of Servs. Agreement*, at 9, ECF No. 126-3, at 10.

> day Updates will also be sent, at no charge, to chief pharmacists of all major U.S. hospitals. Company may offer and make available the 2014 PDR and PDR 60-day Updates to other healthcare professionals in pharmacies, dental practices, nursing homes, hospitals, and schools of nursing as well as the general public.

*App. 1 of Servs. Agreement*, at 9, ECF No. 126-3, at 10. The Services Agreement does not contain any provision in which Bayer agrees to pay PDR Network any additional funds based on how many eBooks are distributed. In fact, the Services Agreement does not mention the eBook at all.

During discovery, Plaintiff deposed Barbara A. Senich, who served as Senior Vice President of Marketing and Product Line Management for PDR Network from late 2013 to early 2014. In her deposition, Ms. Senich explained that PDR Network sold products and services to pharmaceutical companies and that the eBook was a brand new method PDR Network used to get Product Information to healthcare providers. *Barbara Senich Dep.* 12:21-22; 16:9-17 (Apr. 16, 2024), ECF No. 126-2. When specifically questioned about the Bayer Services Agreement, PDR Network objected to this testimony as the Services Agreement was outside the scope of Ms. Senich's designation under Rule 30(b)(6) of the Rules of Civil Procedure. *Id*. 30:22-24; 31:1-4. Nevertheless, when asked about the language in Appendix 1 of the Services Agreement, the following discussion occurred between Plaintiff's counsel and Ms. Senich:

> BY [PLAINTIFF'S COUNSEL]:
> Q.   And if I could—I'm going to skip; okay? I'm going to read, "Company will distribute the product information," and I'm going to skip two lines and I'm going to say "To U.S. medical doctors and doctors of osteopathy, whose medical practice requires reference information on prescription drugs."
>
> Is it fair to say that that's what the pharmaceutical companies—that's one of the things the pharmaceutical companies are paying for, paying PDR Network for?
>
> \*      \*      \*
>
> THE WITNESS: Yeah. The –the basic drug information and

> 60-day updates, again, I think I had said that the updates were important to pharmaceutical companies.
>
> Different ones value different, sort of, target audiences or groups of healthcare providers.
>
> But generally speaking, the value—for at least this particular service, or the DIS, was proactively sending out the information so that physicians and others could prescribe and help patients who may be taking a medication. So—
>
> BY [PLAINTIFF'S COUNSEL]:
> Q. And, Ms. Senich, I want to focus on that word, "distribute," in the first sentence of this paragraph, because my question is, the pharmaceutical companies, they're paying to have their drugs listed in the PDR, in the Physicians' Desk Reference, I understand that.
>
> But they also want PDR to put the Physicians' Desk Reference in the hands of healthcare providers; isn't that correct?
>
> \*　　\*　　\*
>
> THE WITNESS: Yes. Generally speaking, they want the information so that the—their products, meaning the pharmaceutical industry's products, can be safely used by healthcare providers.

*Id*. at 38:2-24; 39:1-18. Plaintiff asserts Ms. Senich's statements show that the fax benefitted PDR Network directly because the distribution of the eBook was part of PDR Network's business model.

However, following her deposition, Ms. Senich submitted a Declaration in which she expounded upon her deposition testimony. Ms. Senich stated that the PDR Network generally "made money by providing the DIS (among many other services) to pharmaceutical companies." *Barbara A. Senich Decl*. ¶7, in part. According to Ms. Senich, the "PDR Network did not make money based on the number of eBooks distributed" or the number of faxes sent. *Id*. ¶¶12, 13. "Instead, PDR Network was paid at the time of contract for the listing of the FDA-approved drug label information in DIS including the *PDR*." *Id*. ¶13, in part. Ms. Senich further stated that PDR

Network did not even track the number of eBooks downloaded during the relevant period in the First Amended Class Action Complaint. *Id.* ¶15.

Given this evidence, PDR Network argues it is entitled to summary judgment because there is no evidence that the fax's pitch—the availability of the eBook—resulted in a commission when the pitch was successful and a healthcare provider downloaded the eBook. As the pharmaceutical companies paid upfront at the time of the contract for a DIS subscription, PDR Network insists it received no monetary benefit from downloaded eBooks. Thus, PDR Network argues there is no "commercial nexus" as required under the TCPA.

To the contrary, Plaintiff argues a fact finder easily could find a commercial nexus exists when a recipient accepts a fax's pitch and downloads an eBook to PDR Network's business model. However, as previously stated, the only Services Agreement produced in discovery does not include the eBook in the DIS suite of services that was purchased by Bayer. While Appendix 1 of the Services Agreement does include language in which Bayer grants PDR Network "a non-exclusive right . . . to distribute . . . the Product Information . . . in any format . . . now known or hereinafter developed[,]" the very next sentence of the Agreement provides that PDR Network *"will distribute the Product Information in the PDR Drug Information Services™ which shall include the 2014 PDR . . . and PDR 60-day Updates . . . ." App. 1 of the Servs. Agreement*, at 8-9 (emphasis added). When Plaintiff's counsel asked Ms. Senich about this same paragraph, the language he omitted from his question to her was the qualifying language referring to the Product Information specifically being distributed "in the PDR Drug Information Services™ which shall include the 2014 PDR . . . and PDR 60-day Updates." *Id*. at 9. There is nothing in this language requiring distribution beyond the DIS subscription Bayer purchased. In fact, Plaintiff has not pointed to any language in the Services Agreement or the Appendix showing Bayer was even

aware that PDR Network intended to release its first edition of the eBook. Moreover, Ms. Senich definitively stated in her Declaration that if she "had been asked about 'commissions' or monies earned either directly or indirectly from the number of eBooks distributed at [her] deposition, [she] would have testified, and do so here testify, that PDR Network did not make money based on the number of eBooks distributed." *Senich Decl.* ¶12, in part.

Plaintiff further complains that PDR Network only produced the Services Agreement it had with Bayer even though Plaintiff requested in discovery "[a]ny agreement between PDR Network and any entity whose products are listed in the 2014 eBook pertaining to the manner in which PDR Network is 'indirectly funded by pharmaceutical companies' that was in effect during the Relevant Time Period." *Def. PDR Network, LLC's Resps. and Objs. to Pl.'s First Set of Requests for Prod. of Docs.*, at 8, ECF No. 113-2. When Plaintiff served its request, PDR Network objected arguing it was "overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks '[a]ny agreement' for a 4-year period." *Id*. It also objected to the extent some of the information sought contains confidential and/or proprietary materials and the request references "indirect funding." *Id.* Nevertheless, PDR Network stated it would produce exemplar agreements. *Id.* at 9. Upon Plaintiff's Motion to Compel, the Magistrate Judge agreed with PDR Network that Plaintiff's request was "beyond the scope of permissible discovery." *Mem. Op. and Order*, at 7 (April 3, 2024), ECF No. 117.

Plaintiff asserts the Services Agreement that was produced is customized to Bayer and, therefore, the Court should not infer it represents agreements PDR Network has with other pharmaceutical companies. However, the Bayer Services Agreement is the only Agreement before the Court. Plaintiff did not file any objection to the Magistrate Judge's Order or file any further motions to compel or otherwise seek the production of additional Services Agreements. While

Plaintiff insists the Court must draw any permissible inference from the underlying facts in the light most favorable to it as the nonmoving party,[8] there must be some evidence other Services Agreements would support Plaintiff's commission allegation that "the amount of money that Defendants receive from the drug companies whose products are featured in the 2014 PDR e-Book turns on how many copies of the 2014 PDR e-Book Defendants distribute, and so Defendants stand to profit when a provider accepts a free copy." *First Am. Class Action Compl.* ¶20. Here, the Court finds none.

Despite discovery, Plaintiff has uncovered no evidence that PDR Network has any kind of payment arrangement with a pharmaceutical company based upon on how many copies of the 2014 PDR eBook were distributed. Instead, the Bayer Services Agreement only shows the cost for listing Bayer's two drugs with a subscription to the 2014 DIS suite of products which does not include the eBook among the subscription "Services" provided under the contract. There is nothing in the Services Agreement that contemplates Bayer paying additional sums based on the distribution of an eBook, and the amount due was calculated before any eBooks were even distributed. Likewise, while Plaintiff argues the Court should infer that Bayer would have paid less if its listings were not distributed in the eBook, such an inference would be purely speculative as Plaintiff has presented not a scintilla of evidence to support it.

Shortly after the motion for summary judgment became ripe in this case, the Fourth Circuit issued its decision in *Family Health Physical Medicine, LLC v. Pulse8, LLC*, 105 F.4th 567 (4th Cir. 2024), which repeatedly references *PDR VI*. In supplemental briefing ordered by this Court, Plaintiff argues *Pulse8* makes it clear that it need not show PDR Network received a direct profit when a fax recipient accepts a free eBook. Rather, it can prove a commercial nexus exists because

---

[8]*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587.

PDR Network gets paid to distribute Product Information and the eBook was one of its distribution methods. However, this assertion is substantially different than the commission allegation Plaintiff actually makes in paragraph 20 of its First Amended Class Action Complaint, where it alleges PDR Network is paid by pharmaceutical companies based "on how many copies of the 2014 PDR e-Book Defendants distribute[.]" *First Am. Class Action Compl.* ¶20. In addition, the Court agrees with PDR Network that the language Plaintiff relies upon in *Pulse8* is premised on a pretext theory, which the Fourth Circuit rejected as a theory in this case.

Specifically, in *Pulse8*, a medical coding technology company sent the plaintiff an unsolicited fax containing an internet link and an invitation to attend a free webinar that was used to promote medical coding technology the company sold. 105 F.4th at 569. The fax also included an opportunity to win an Amazon gift card if a recipient completed a webinar survey. *Id.* at 570. The plaintiff filed suit alleging the fax violated the TCPA, but the district court dismissed the complaint finding the fax did not fit within the TCPA's definition of an unsolicited advertisement. *Id*.

Applying *PDR VI*, the Fourth Circuit reiterated that the definition of an "unsolicited advertisement" under the TCPA must have a "'commercial component or purpose' and that, as a result, merely 'promot[ing] the quality of a free good or service' is not enough to make something an advertisement." *Id*. (quoting *PDR VI*, 80 F.4th at 474-75; quotation marks removed in *Pulse8*). Therefore, the Fourth Circuit found the fax informing a recipient of a "free webinar did not, standing alone, make it an advertisement." *Id*. (citation omitted). However, where it was "alleged that the fax was an advertisement because it promoted a webinar that 'relate[d] to [Pulse8's] for-profit-business'—selling software containing medical coding technology," the Fourth Circuit found the complaint sufficiently alleged a commercial nexus because the free webinar could be

leveraged as a sales pitch. In other words, the fax was a pretext to get recipients to buy Pulse8's products. *Id.* at 571-72. Likewise, the Fourth Circuit found Plaintiff sufficiently alleged a commercial nexus by claiming that the contact information of those who signed up for the webinar was used to send future promotional materials. *Id*. at 573. Again, the fax was a pretext to future advertising.[9]

Plaintiff argues the fax in *Pulse8* is similar to the fax in this case because both faxes have a "nexus" to the senders' businesses. However, the Fourth Circuit in *Pulse8* found the plaintiff plausibly alleged the fax was a pretext in which it was attempting to get the fax recipients to buy its products and share their contact information for future promotions. On the other hand, in this case, PDR Network is not attempting to get the fax recipients to buy anything, and the Fourth Circuit already ruled that Plaintiff's pretext theory is not viable. Instead, the Fourth Circuit remanded this case to determine whether there is evidence to support Plaintiff's allegation that the pharmaceutical companies paid PDR Network a commission based on how many eBooks were downloaded. As previously stated, there simply is no evidence to support this claim. Therefore, the Court finds summary judgment in favor of PDF Network is appropriate.

## IV.
## CONCLUSION

Accordingly, the Court finds Plaintiff has failed to produce sufficient evidence upon which a reasonable juror could find that the fax sent by PDR Network had the necessary commercial character to make it an "unsolicited advertisement" under the TCPA. The Court, therefore, **GRANTS** PDR Network's Motion for Summary Judgment. ECF No. 126. As the only Defendants

---

[9]The Fourth Circuit distinguished this claim from the one in *PDR VI* in which Plaintiff alleged PDR Network would continue to send faxes even if Plaintiff did not accept the free eBook. *Id.* at 574.

now remaining in this matter are John Does 1-10 and Plaintiff has not identified any John Does throughout the long course of this litigation, the Court finds the time to identify them has passed and also **DISMISSES** them from this action.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: November 21, 2024

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE